OPINION
{¶ 1} Defendant-appellant, David L. Reed ("appellant"), appeals from the judgment of conviction of the Franklin County Court of Common Pleas entered after a jury trial in which appellant was found guilty of one count of receiving stolen property, a fourth-degree felony, in violation of R.C. 2913.51, one count of failure to comply with an order or signal of a police officer, a third-degree felony, in violation of R.C. 2921.331, and one count of failure to comply with an order or signal of a police officer, a fourth-degree felony, in violation of R.C. 2921.331. *Page 2 
 {¶ 2} The facts underlying these charges, as adduced at trial, are as follows. In the early morning hours of June 15, 2006, 86-year-old Sonnie Byrne ("Byrne"), was awakened by a telephone call from her neighbor and was informed that her car, a white Plymouth Acclaim, had just been stolen from her senior condominium parking lot. According to Byrne's neighbor, two black males forcibly broke into and took the car, and Byrne's neighbor had called the police just prior to calling Byrne. Byrne testified she had previously locked the car, had not left the keys in the car, and had not given anyone permission to take the car.
 {¶ 3} Around 6 p.m. that same day, Columbus Police Officer Robert Fihe saw a vehicle matching the description of the stolen vehicle. Officer Fihe ran the tags, and he was informed the stolen car had been reported stolen. However, by the time Officer Fihe received this information, he had lost sight of the vehicle, so he called Columbus Police Officer Stephen Conkel, who was patrolling the same area. Officer Conkel reported he saw the car at the intersection of 13th Street and Cleveland Avenue. Officer Conkel waited for backup and then initiated a traffic stop. Officer Fihe was about 100 yards away when he saw Officer Conkel turn on the cruiser's lights, and then the white car took off westbound on 11th Avenue. Officer Conkel gave chase, as did Officer Fihe who was just behind Officer Conkel. Speeds reached 55 miles per hour in a largely residential 25-to-35-miles-per-hour zone. The chase ended when the white Acclaim went through a red light at an intersection and a red van "t-boned" the driver's side of the white Acclaim. The collision occurred at the intersection of 4th Street and 7th Avenue. Three occupants exited the white Acclaim and ran. One of the fleeing persons, later identified as Joey McKinney ("McKinney"), ran into the path of Officer Fihe's cruiser, which struck McKinney. *Page 3 
 {¶ 4} Officer Conkel saw the front and backseat passengers, black males wearing black shirts, exit the passenger's side of the vehicle and run westbound. Officer Conkel then observed the driver, a black male wearing a blue shirt and blue jean shorts, exit the passenger's side of the vehicle and run behind a house on North 4th Street. The driver ran about a half block. Officer Conkel chased the driver, and within less than one minute, Officer Conkel caught up to the man, who had removed his shirt and was now sitting on the front porch of a house breathing heavily and sweating profusely. When asked what he was doing, the man replied he was waiting for some friends. Though no longer wearing the blue shirt, Officer Conkel testified he was positive this was the man he was chasing. The house was vacant with a lockbox on the front door and a for sale sign in the yard. Officer Conkel placed the man, identified as appellant, under arrest. A blue shirt was found on the north side of the porch.
 {¶ 5} Officer Fihe inventoried the white Acclaim and found a screwdriver that, according to Byrne, was not in the car prior to its being taken. Also, the white Acclaim's rear driver's side door was caved in by heavy impact.
 {¶ 6} Brock Anderson ("Anderson") was stopped at the intersection of 7th Avenue and 4th Street at about 6:15 p.m. on the subject date when he saw a white four-door car being pursued by the police. The white car ran a red light and a red vehicle hit the driver's side of the white car. Anderson saw three black males flee from the car and was certain the driver fled northbound on 4th Street, the front passenger fled westbound and was hit by a police cruiser, and the rear passenger disappeared into the crowd.
 {¶ 7} Tahnelle "Tony" Cornute ("Cornute") was walking down the street when he saw McKinney and appellant in a car. The pair indicated they were going to look for girls *Page 4 
and Cornute asked if he could ride along. Cornute testified he was the front passenger, McKinney was driving, and appellant was in the backseat. According to Cornute, McKinney was using keys to drive the car. After the collision, Cornute explained he simply stood there and watched with the crowd while McKinney got hit by a cruiser and appellant ran away. Cornute did not talk to the police that day and testified that the first time he told this story was the day of trial.
 {¶ 8} Appellant also testified on his own behalf. Appellant stated he, McKinney, and Cornute went driving around to meet some girls in a white four-door car that McKinney was driving. Appellant denied knowing the car was stolen. According to appellant, when McKinney began fleeing from the police in the car, appellant and Cornute told McKinney to stop, but McKinney would not listen. Appellant testified he did not want to be charged with fleeing because he "already had a warrant." (Tr. Vol. II, 280.) Further, appellant testified that, after the collision, he just jumped out and ran north and sat on a porch. Appellant stated he did not take his shirt off, and that he told the officer he was not the driver of the car.
 {¶ 9} On June 23, 2006, appellant was indicted on the previously described charges, namely, one count of receiving stolen property and two counts of felony failure to comply. A jury trial began on May 31, 2007, and on June 4, 2007, the jury returned guilty verdicts on all counts. A sentencing hearing was held on December 11, 2007, at which time appellant was sentenced to an aggregate term of five years and six months' incarceration. Appellant was awarded 337 days of jail-time credit.
 {¶ 10} This appeal followed, and appellant brings the following four assignments of error for our review: *Page 5 
 FIRST ASSIGNMENT OF ERROR
 Appellant was deprived of the effective assistance of counsel due to counsel's errors and omissions, including eliciting testimony regarding Defendant-Appellant's prior assertion of his Fifth Amendment rights, regarding Defendant-Appellant's then-outstanding arrest warrant; and for failing to request a jury instruction regarding a key witness's failure to testify.
 SECOND ASSIGNMENT OF ERROR
 Appellant's convictions for Receiving Stolen Property and for Failure to Comply were against the manifest weight of the evidence. These errors deprived Appellant of his right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section Sixteen of the Ohio Constitution.
 THIRD ASSIGNMENT OF ERROR
 The trial court erred when it prohibited Joey McKinney from testifying and asserting his Fifth Amendment Rights against Self-Incrimination before the jury, in violation of Article I, Section 10 of the Ohio Constitution, the Due Process Clause of the Ohio and United States Constitutions and Columbus v. Cooper (1990), 49 Ohio St.3d 42.
 FOURTH ASSIGNMENT OF ERROR
 The trial court erred in sentencing Appellant to a maximum prison term for receiving Stolen Property, when it ran this sentence consecutively rather than concurrently to the sentence for Failure to Comply, when it sentenced Appellant to more than the minimum sentence and, in failing to consider the factors in R.C. 2921.331(C)(5)(b), in contravention of the Sixth Amendment to the United States Constitution and the Ex Post Facto and Due Process Clause of the United States Constitution. Blakely v. Washington (2004), 542 U.S. 296; United States v. Booker (2005), 543 U.S. 220.
 {¶ 11} In his first assignment of error, appellant contends he was denied effective assistance of trial counsel. Specifically, appellant makes four arguments under this assigned error: (1) his counsel erred in eliciting testimony from Officer Conkel regarding *Page 6 
appellant's assertion of his Fifth Amendment rights; (2) his counsel erred in eliciting testimony from Officer Conkel about appellant's prior outstanding arrest warrant; (3) his counsel erred in failing to request that McKinney be required to assert his Fifth Amendment privilege in front of the jury and erred in failing to request a jury instruction on McKinney's failure to testify; and (4) there are "miscellaneous examples" of ineffective assistance of counsel.
 {¶ 12} "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington (1984), 466 U.S. 668,686, 104 S.Ct. 2052. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. Id. at 687. The defendant must then establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 13} According to Strickland:
 A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted *Page 7 
from a breakdown in the adversary process that renders the result unreliable.
Id. at 687.
 {¶ 14} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, quotingMichel v. Louisiana (1955), 350 U.S. 91, 101, 76 S.Ct. 158. A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel. State v. Hester
(1976), 45 Ohio St.2d 71, 75.
 {¶ 15} "Under Ohio law, a licensed attorney is presumed competent, and `effective assistance of counsel does not equate with a winning defense strategy,' nor do debatable trial tactics necessarily constitute a violation of defense counsel's duties." State v. Reeves, Franklin App. No. 05AP-158, 2005-Ohio-5838, at ¶ 23. Trial counsel's decisions regarding the calling of witnesses, including the defendant, is within the purview of trial strategy. State v. Coulverson (Mar. 21, 2002), Franklin App. No. 01AP-893, 2002-Ohio-1324; State v. Coulter (1992),75 Ohio App.3d 219, 230; State v. Hunt (1984), 20 Ohio App.3d 310, 312.
 {¶ 16} The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. State v. Conway, *Page 8 109 Ohio St.3d 412, 2006-Ohio-2815, at ¶ 101, citing State v.Hoffner, 102 Ohio St.3d 358, 2004-Ohio-3430; State v. Campbell (2000),90 Ohio St.3d 320, 339. In addition, to fairly assess counsel's performance, "`a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Id., quoting Strickland, 466 U.S. at 689,104 S.Ct. at 2065.
 {¶ 17} Appellant first takes issue with his trial counsel's cross-examination of Officer Conkel. Appellant asserts trial counsel elicited information regarding appellant's asserted Fifth Amendment privilege in violation of Doyle v. Ohio (1976), 426 U.S. 610,96 S.Ct. 2240. On direct examination, Officer Conkel explained that he asked appellant what he was doing on the porch, to which appellant replied that he was waiting for some friends. Officer Conkel testified he had no other conversation with appellant other than to tell him he was under arrest and place him in handcuffs. The following cross-examination is that with which appellant takes issue:
 Q. No. Now, once you apprehended Mr. Reed on the porch, you took him down for slating at the main jail, true?
 A. Yeah, after all the paperwork is completed and everything else. He did not go there immediately,
no.
 Q. Okay. So there was some time before you got to the main jail?
 A. Yes, sir. Quite a bit of time, actually.
 Q. Did you ask Mr. Reed if he bailed from the car and, I mean, did he exit and run from the vehicle?
 A. After I read him his rights, he refused, so I didn't ask him any questions at that point. He signed a refusal to answer my questions, so after his Miranda rights were read and he refused, I didn't ask him any questions.
 Q. Could you summarize those rights for us, sir? *Page 9 
 A. I mean, if I — I usually, honestly, sir, I usually read them off a sheet of paper and my memory isn't good enough to recite them verbatim. I'm sorry. If I could have the sheet of paper in front of me I'd read them directly to you.
 Q. I don't think there's any need for them. I'm fascinated by the contents of Miranda. In Miranda, there's a warning in Miranda that warns the party not to say anything, doesn't it?
 A. Yes, sir.
 Q. Why does it warn them not to say anything?
 A. Self incrimination.
 Q. I don't think that's what it says, though, is it?
 A. No, it's not.
 Q. What does it say? Would you like to see a copy of the Miranda rights?
 A. Yes, I would, please.
 Q. I'm sorry, maybe I — and I appreciate the State's assistance on this matter, because this is — this is ancillary to the examination, and-
 [Prosecutor]: Judge, may we approach?
(Tr. Vol. I, 192-194.)
 {¶ 18} At this time a sidebar conference was held off the record between counsel and the trial court. When the trial resumed, the following exchange occurred:
 Q. I have marked Defendant's Exhibit B, and that is the rights waiver. That is the rights form that you read to Mr. Reed. And if you would, sir, for the sake of brevity, if I may, would you please read the first three sentences of that statement that you provided to him?
 A. Yes, sir. *Page 10 
 "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him or her present with you during questioning."
 Q. Okay.
 * * *
 Q. No, I apologize. The point I'm trying to make is that he exerted his right, but the important matter is this: "Used against you." Read that again, please.
 A. "Anything you say can be used against you in court."
 Q. Do you suppose that's why he didn't talk to you about this incident?
 [Prosecutor]: Objection, Judge. Speculation.
 [Court]: Sustained.
 [Appellant's counsel]: Okay. Okay.
 Q. I just want to make it clear that he had that right and that he exerted that right, that anything you say not be used against him.
 Prior to your reading his Miranda and your discussions on the way, perhaps back south on 4th, did you ask him any questions?
 A. No, I don't believe I did. I waited until I got into the cruiser.
Id. at 194-196.
 {¶ 19} Appellant contends his counsel's questioning and elicitation of appellant's Fifth Amendment privilege runs afoul of Doyle, supra. The issue in Doyle was whether "a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after *Page 11 
receiving Miranda[1] warnings at the time of his arrest." Id. at 611. The Doyle Court held that due process prohibits the government's use of a defendant's post-arrest, post-Miranda silence for impeachment purposes. State v. Exum, Franklin App. No. 05AP-894, 2007-Ohio-2648, at ¶ 37. Doyle involved two defendants that were given Miranda warnings and then remained silent about their involvement in the crime. Each defendant testified they had been framed by narcotics agents. On cross-examination, the prosecutor attempted to impeach the defendants by asking why they had not shared the "frame story" with the police at the time of their arrest. The Supreme Court of Ohio held:
 * * * Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. * * *
Id. at 618.
 {¶ 20} Despite appellant's reliance on Doyle, we are not presented with a scenario guided by the same. First of all, we note that despiteDoyle's prohibitions, a prosecutor may question a defendant about post-arrest silence without a Doyle violation if the defendant has raised the issue on direct examination. State v. Lloyd, Warren App. No. CA2007-04-052, 2008-Ohio-3383, at ¶ 26. "If defense counsel opens the subject area in direct examination, it is not improper for the prosecutor to cross-examine the defendant on the same matter." State v.Eason, Belmont App. No. 02 BE 41, 2003-Ohio-6279, at ¶ 30, quotingState v. Holland (Oct. 25, 1984), Cuyahoga App. No. 47923. *Page 12 
 {¶ 21} Here, we are even further removed from Doyle's application because the case at bar is not a case in which the prosecution commented at all, much less on its own initiative, on appellant's silence. Rather, appellant invited the questioning on cross-examination of Officer Conkel. Under such circumstances, Ohio courts have consistently found noDoyle violations. State v. Stevenson (July 21, 2000), Erie App. No. E-94-002 (because appellant's trial counsel elicited two answers concerning the defendant's post-Miranda silence, the rule inDoyle was inapplicable); State v. Vaughn (July 11, 1985), Cuyahoga App. No. 49272 (the issue of the defendant's post-arrest silence was raised first by the defendant's counsel on direct examination; therefore, the defendant waived any rights under Doyle and the prosecution was permitted to cross-examine the defendant on this issue); State v.Lee (Dec. 31, 1997), Trumball App. No. 95-T-5371 (Doyle inapplicable where appellant's attorney facilitated the presentation of the testimony referring to appellant's silence after being given Miranda rights, and "admission of such testimony is not reversible error, since it was invited by the questioning of appellant's attorney"); State v.Lamb, Butler App. No. CA 2002-07-171, 2003-Ohio-3870 (no Doyle violation of prosecutor's cross-examination of the defendant regarding the defendant's post-arrest, post-Miranda silence where the issue was first raised by the defendant); Eason, supra (no Doyle violation where the prosecutor commented on the defendant's post-arrest silence when the defendant testified about his silence as part of his defense);Exum, supra (no Doyle violation where the prosecutor's comments regarding the defendant's silence were invited by defendant when he testified he was withheld from telling his side of the story). *Page 13 
 {¶ 22} More applicable to the matter at hand is State v. Vance, Ashland App. No. 2007-COA-035, 2008-Ohio-4763, in which the Fifth Appellate District stated:
 In the case at bar, the prosecutor did not initially question Deputy Kline about appellant's post-arrest silence. The inquiry was made only after the defense questioned why the Deputy only obtained a written statement from, and photographs showing the injuries to, the victim. * * *
Id. at ¶ 47. See, also, Stevenson, supra; State v. Williams (July 5, 1995), Cuyahoga App. No. 66864 (Doyle prohibitions are only imposed upon the prosecution and do not pertain to a defendant's trial counsel);Lloyd, supra (no Doyle violation where defendant's counsel rather than the prosecutor initially questioned the defendant about post-arrest silence).
 {¶ 23} The prohibitions defined by Doyle not being applicable here, the standard by which we review this issue is that set forth inStrickland, supra. As stated previously, "the scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." Conway at ¶ 101. "The decision regarding whether to inquire into defendant's post-arrest statements are matters soundly within the province of trial counsel."Williams, supra.
 {¶ 24} Appellant testified that he told the arresting officer that he was not the driver of the fleeing car. Thus, it appears appellant's counsel was inquiring on cross-examination of Officer Conkel as to what appellant told Officer Conkel in an attempt to bolster appellant's story about which he would later testify. The fact that Officer Conkel denied appellant said anything about not being the driver of the car does not constitute counsel's ineffectiveness. Rather, it appears trial counsel was merely attempting to bolster the veracity of appellant's testimony by getting Officer Conkel to admit that appellant denied at the scene that he was the driver of the car. This is bolstered by a side *Page 14 
bar that was later put on the record in which the prosecutor expressed concern over trial counsel's questioning of Officer Conkel. The prosecutor wanted the record to clearly reflect that defendant's counsel, not the prosecutor, opened the door on defendant's post-arrest silence, to which appellant's counsel responded "[e]ssentially I did, and there's foundation for my case as far as my client's testimony." (Tr. Vol. I, 204.) Thus, despite the fact that appellant did not testify until after Officer Conkel testified, it is clear from the record on what theory appellant's trial counsel was proceeding.
 {¶ 25} From review of the record, we cannot conclude that, under these circumstances, trial counsel's cross-examination of Officer Conkel regarding appellant's alleged denial was an unreasonable tactic to use.Williams, supra; see, also, Hoffner, supra; Stevenson, supra.
 {¶ 26} Next under this assignment of error, appellant contends his trial counsel erred in eliciting testimony that appellant had a warrant at the time of his arrest. During the cross-examination of Officer Conkel, appellant's counsel asked about the slating procedure. Officer Conkel testified appellant "had an unrelated warrant he needed to speak to a detective about." (Tr. Vol. 1, 197.) Thereafter, the following exchange took place:
 Q. So you arrest him on a warrant?
 A. Yes.
 Q. You didn't arrest him on that slating?
 A. No. I submitted that he get an indictment from the grand jury. I requested that in the back of the U-10.
 Q. And it says it on there, doesn't it? *Page 15 
 A. It says it in my body. This is just the front page. There's continuation forms.
 Q. Isn't there a paragraph on the front, center bottom that says what that warrant is for on the front?
 A. Yes, sir.
 Q. It does, doesn't it?
 A. Yes, sir.
Id. at 198.
 {¶ 27} Thereafter, a sidebar conference was held on the record in which the prosecutor expressed his concern regarding the officer testifying that appellant had an outstanding warrant for attempted murder, and the potential risks involved with such disclosure. Appellant's counsel indicated as long as the charge was redacted, he would move on from the matter, as his goal was to establish that appellant ran, not because appellant knew the car was stolen but, rather, because appellant had an outstanding warrant. The important aspect here is that even though appellant's counsel did not initially seek the redaction, the information complained of never made it before the jury. Thus, clearly, appellant cannot establish prejudice even if we assume appellant is correct that his counsel erred in seeking to introduce appellant's prior unredacted arrest warrant, as appellant is unable to show that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different.
 {¶ 28} Further, contrary to appellant's assertion, we do not find this to be a concession of guilt to the failure-to-comply charges. Appellant's failure-to-comply charges allege fleeing in a motor vehicle after being instructed to stop by a police officer. Appellant argued: (1) he was not the driver of the fleeing car; and (2) he fled on foot after *Page 16 
the collision, not because he was aware the car he was in was stolen, but because he had an outstanding arrest warrant that was later dismissed.
 {¶ 29} Third, under this assigned error, appellant contends his counsel should have requested that McKinney be required to appear and assert his Fifth Amendment privilege before the jury, and his counsel should have requested a jury instruction on McKinney's failure to testify. Appellant testified that he did not know the vehicle was stolen and that he was not the driver of the vehicle. Instead, appellant testified that McKinney was the driver of the car. Because appellant sought to have McKinney testify, the trial court appointed counsel for McKinney to discuss the matter. Counsel for McKinney appeared at the trial and informed the court, on the record and out of the jury's presence, that McKinney indicated if called upon to testify, he would assert his right not to testify for concern of self-incrimination. The prosecutor told the trial court that there was an agreement not to call McKinney, and when asked if this was correct, appellant's counsel stated, "Yes, your Honor. I don't think there would be any benefit to defense simply having him assert the Fifth on the stand, your Honor, gain anything material to this case." (Tr. Vol. II, 220-221.)
 {¶ 30} On appeal, appellant now contends under Columbus v. Cooper
(1990), 49 Ohio St.3d 42, his counsel should have been permitted to call McKinney as a witness and that under State v. Kirk (1995),72 Ohio St.3d 564, his counsel should have requested a jury instruction regarding McKinney's absence as a witness in this trial.
 {¶ 31} First, we note the record discloses not that the trial courtprohibited anyone from calling McKinney as a witness but, rather, that counsel agreed not to call McKinney to testify in light of the belief that McKinney would merely assert his Fifth Amendment *Page 17 
rights. Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court. State v. Treesh (2001), 90 Ohio St.3d 460, 490, citingState v. Williams (1991), 74 Ohio App.3d 686, 695.
 {¶ 32} Secondly, the matter before us is distinguishable fromKirk, supra. In Kirk, the defendant wanted to call a witness as part of his defense even though the witness made it clear to the court and to counsel that the witness would claim Fifth Amendment protection. The trial court excused the witness from answering a subpoena and the defendant appealed. The Supreme Court of Ohio found no error in the trial court's refusal to permit the defendant to call the witness. TheKirk court held:
 1. A trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination. (Columbus v. Cooper [1990], 49 Ohio St.3d 42, 550
N.E.2d 937, distinguished and limited.)
 2. Where a defendant is not entitled to call a witness to the stand because of the witness' intention to assert the Fifth Amendment privilege against self-incrimination, the defendant is entitled to request an instruction that the jury should draw no inference from the absence of the witness because the witness was not available to either side.
Id. at syllabus at paragraphs one and two.
 {¶ 33} In this case, appellant's counsel decided not to call McKinney as a witness. Therefore, the trial court did not completely exclude McKinney from appearing on appellant's behalf, and "it follows that the appellant was not absolutely entitled to an instruction to the jury that no inference should be drawn from the absence of the witness." State v.Mitchell (June 30, 1999), Lucas App. No. L-97-1283; State v.Branham (June 5, 1995), Butler App. No. CA94-03-075 (there is no evidentiary value to having a witness *Page 18 
assert the Fifth Amendment privilege against self-incrimination and the appellant offered no justification for calling the witness to the stand other than for the purpose of having the witness invoke theFifth Amendment in front of the jury). Further, "counsel's decision not to request a jury instruction falls within the ambit of trial strategy[,]" and "debatable trial tactics do not constitute ineffective assistance of trial counsel." Conway, supra, at ¶ 111.
 {¶ 34} Lastly, appellant directs us under this assigned error to "miscellaneous examples of ineffective assistance of trial counsel." (Appellant's Brief, at 10.) The examples are: (1) trial counsel's failure to object on the basis of speculation to Officer Conkel's testimony that he focused on the driver because the driver is more likely to know the vehicle was stolen; (2) trial counsel's failure to draft a jury instruction regarding the warrant and that the jury should not speculate as to the warrant issue; (3) trial counsel's statement in closing argument where he implied he failed to present evidence; and (4) trial counsel's failure to raise arguments under Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, and United States v.Booker (2005), 543 U.S. 220, 125 S.Ct. 738, at sentencing.
 {¶ 35} Upon review of the record, we find that even assuming arguendo that these four examples did, in fact, constitute clear error, appellant cannot establish there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different, such that there is a probability sufficient to undermine the confidence in the outcome. Strickland, at 694.
 {¶ 36} For the foregoing reasons, we overrule appellant's first assignment of error.
 {¶ 37} In his second assignment of error, appellant contends his convictions are against the manifest weight of the evidence. Appellant does not challenge the sufficiency *Page 19 
of the evidence or assert that the state failed to produce evidence as to an element of the offenses for which he was convicted. Instead, the basis for appellant's manifest-weight argument is the state's failure to produce any direct evidence in this case.
 {¶ 38} "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 35, citation omitted. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact finder's resolution of the conflicting testimony. State v. Thompkins (1997), 78 Ohio St.3d 380,387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quoting State v. Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 39} A defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v.Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, *Page 20 
at ¶ 58; State v. Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. The trier of fact is free to believe or disbelieve all or any of the testimony. State v. Jackson (Mar. 19, 2002), Franklin App. No. 01AP-973;State v. Sheppard (Oct. 12, 2001), Hamilton App. No. C-000553. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 22; State v.Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 17.
 {¶ 40} Additionally, the Supreme Court of Ohio has held that "[a] conviction can be sustained based on circumstantial evidence alone."State v. Franklin (1991), 62 Ohio St.3d 118, 124, citing State v.Nicely (1988), 39 Ohio St.3d 147, 154-155. In fact, circumstantial evidence may "`be more certain, satisfying and persuasive than direct evidence.'" State v. Ballew (1996), 76 Ohio St.3d 244, 249, quotingState v. Lott (1990), 51 Ohio St.3d 160, 167, quoting Michalic v.Cleveland Tankers, Inc. (1960), 364 U.S. 325, 330, 81 S.Ct. 6, 11.
 {¶ 41} Appellant was convicted of receiving stolen property pursuant to R.C. 2913.51, which provides in pertinent part:
 (A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.
 {¶ 42} Appellant was also convicted of failure to comply pursuant to R.C. 2921.331, which provides in pertinent part:
 (B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible *Page 21 
signal from a police officer to bring the person's motor vehicle to a stop.
 {¶ 43} Regarding his conviction for receiving stolen property, appellant first argues there is no direct evidence that he was guilty of said charge because there was "zero testimony" regarding whether he knew or had reasonable cause to believe the car was stolen, and he testified that he did not know the car was stolen when he entered it.
 {¶ 44} When, as here, a disputed element of the offense charged is, by its nature, not susceptible of proof by direct evidence, circumstantial evidence may be used to provide an inference of guilt. State v.Caldwell (Nov. 16, 2000), Franklin App. No. 99AP-1107, citing State v.Alexander (June 17, 1987), Hamilton App. No. C-860530. In a prosecution for receiving stolen property, the jury may arrive at a finding of guilt by inference when the accused's possession of recently stolen property is not satisfactorily explained in light of surrounding circumstances developed from the evidence. Id., citing State v. Arthur (1975),42 Ohio St.2d 67. In reviewing such an inference, numerous criteria have been set forth to determine whether reasonable minds could conclude beyond a reasonable doubt that the defendant knew, or had reasonable cause to believe, that property was stolen. Id. In State v. Davis (1988),49 Ohio App.3d 109, 112, the Supreme Court of Ohio enumerated some of these considerations:
 (a) the defendant's unexplained possession of the merchandise, (b) the nature of the merchandise, (c) the frequency with which such merchandise is stolen, (d) the nature of the defendant's commercial activities, and (e) the relatively limited time between the thefts and the recovery of the merchandise. * * *
 {¶ 45} According to appellant, he testified McKinney was driving the car and that McKinney was using the keys to do so. Also, Cornute testified that McKinney, not *Page 22 
appellant, was driving the car that evening and that the car had keys, the steering column was not popped out, and the locks were not broken out. In contrast, Byrne testified there were only two sets of keys to the car, and she had possession of both sets at the time these offenses were committed. Officer Fihe testified that he could not recall whether the steering column had been peeled, but that on this type of car, a screwdriver can be used to "pop" the ignition plate off the steering column and start the car. Just such a screwdriver was found in the car at issue that, according to Byrne, was not in the car prior to its being taken. Also, Officer Conkel testified that after the collision his attention was focused on the driver, later identified as appellant, who ran northbound and was apprehended on the front porch of a vacant house. Officer Conkel testified he was "positive" he arrested the driver. (Tr. Vol. I, 211.) Also, an independent eyewitness, Anderson, testified he was certain the driver fled northbound on 4th Street and was caught shortly thereafter.
 {¶ 46} While clearly we are presented with some conflicting testimony, we reiterate that a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.Moore, supra. The weight to be given to the evidence, and the credibility of the witnesses, are issues primarily for the trier of fact. DeHass, supra. Further, the jury is free to believe all, or any, of the testimony. Jackson, supra. Thus, the fact that the jury may not have found appellant's and Cornute's testimony to be credible is not a basis for reversal on manifest-weight grounds. See State v.Johnson, Summit App. No. 22789, 2006-Ohio-2277 (holding that though the defendant testified he was merely a passenger and not the driver of the car and his version of events differed dramatically from the state's witnesses, the defendant's convictions for *Page 23 
receiving stolen property and failure to comply were not against the manifest weight of the evidence simply because the jury believed the prosecution's testimony).
 {¶ 47} This premise applies equally to appellant's arguments pertaining to his failure-to-comply convictions. The basis for appellant's arguments that his convictions for failure to comply are against the manifest weight of the evidence is that he was not the driver of the car.
 {¶ 48} The identity of a perpetrator may be established by the use of direct or circumstantial evidence. State v. Flynn, Medina App. No. 06CA0096-M, 2007-Ohio-6210, at ¶ 12, citing State v. Gorgan (Jan. 10, 1990), Medina App. No. 1824. While identity is an element that must be proven by the state beyond a reasonable doubt, the credibility of witnesses and their degree of certainty in identification are matters affecting the weight of the evidence. Id., citing State v. Leach, Summit App. No. 22369, 2005-Ohio-2569 (concluding that the identification of the defendant by a police officer plus circumstantial identification evidence supported the jury's determination that defendant was the driver of a car during a chase that led to charges under R.C. 2921.331[B]).
 {¶ 49} As previously discussed, two persons, Officer Conkel and Anderson, testified the driver of the car ran northbound on 4th Street and was apprehended shortly thereafter. Anderson was certain in his testimony pertaining to this issue, and Officer Conkel was positive he arrested the driver of the car. Thus, despite the testimony from appellant and Cornute, who is a "good friend" of appellant's, it is apparent the jury chose to believe the evidence presented by the state, and such does not serve as a basis for a reversal on manifest-weight grounds. (Tr. Vol. II, 248.) Flynn, supra (holding that the defendant's failure-to-comply convictions were not against the manifest weight of the *Page 24 
evidence where the officer's identification of the defendant and the circumstantial evidence supported the jury's verdict, despite the defendant's testimony that he was not the driver of the car).
 {¶ 50} After carefully reviewing the trial court's record in its entirety, we conclude there is nothing to indicate the jury clearly lost its way or that any miscarriage of justice resulted. Consequently, we cannot say appellant's convictions are against the manifest weight of the evidence. Accordingly, we overrule appellant's second assignment of error.
 {¶ 51} In his third assignment of error, appellant contends the trial court erred when it "prohibited" McKinney from testifying in violation of the Ohio and United States Constitutions and Cooper, supra.
 {¶ 52} Initially, we wish to clarify the record as we did in the discussion of appellant's first assignment of error to highlight that there is no indication the trial court prohibited appellant from calling McKinney. Rather, appellant's counsel agreed not to call McKinney. This is evident from the following:
 [Prosecutor]: * * *
 I — my understanding is the defense theory is that Joey was the driver of the car. With that in mind, the Court has appropriately appointed counsel for Mr. McKinney to help discuss whether or not he should testify, and if so, to what. Nathan Akamine is here present in the courtroom. After talking to Mr. McKinney — and I think I will allow Mr. Akamine to go ahead and tell you what the end result of those discussions are.
 [The Court]: Thank you.
 [Mr. Akamine]: Thank you, your Honor. I did speak with Mr. McKinney in private. I advised him of his rights. I advised him of my capacity of informing him of his rights and telling him what the ramifications could be should he testify. *Page 25 
 I asked him about his participation or lack thereof. He informed me of that participation, or lack thereof. After those discussions, I advised him that in my legal opinion it would be in his best interests to assert his Fifth Amendment Right.
 After discussing what that meant, he agreed, and if called upon to testify, he would assert that right not to testify for concerns that anything — well, that the testimony he gave may certainly incriminate himself.
 [The Court]: Thank you.
 * * *
 [Prosecutor]: And with that, Judge, it's my position, I think we've come to an agreement that you can't really put a witness on simply to assert their Fifth Amendment Right, so I think if would be improper for Mr. McKinney to even get on the stand knowing that that's what he's going to do, but we wanted to make this record in part because if there were already future proceedings, it makes a record of his — I guess since he's not going to testify it doesn't matter, but just to make clear why he's not testifying.
 [Appellant's Counsel]: And in the potentiality [sic] of it being appealed for any verdict adverse to Mr. Reed.
 [The Court]: All right. [Appellant's Counsel], are you okay with that?
 [Appellant's Counsel]: Yes, your Honor.
 [The Court]: Not calling him, then?
 [Appellant's Counsel]: Yes, your Honor. I don't think there would be any benefit to defense simply having him assert the Fifth on the stand, your Honor, gain anything material to this case.
(Tr. Vol. II, 218-221.)
 {¶ 53} There was no effort to call McKinney, to proffer McKinney as a witness, or any request to personally question McKinney on the issue of invoking the *Page 26 Fifth Amendment. Further, the record is void of any evidence to suggest that McKinney would have done anything other than invoke his Fifth Amendment rights.
 {¶ 54} Secondly, despite appellant's continued reliance onCooper, there is no "right" of defendant to call a witness solely for the purpose of invoking his or her Fifth Amendment rights in front of the jury. In Cooper, the Supreme Court of Ohio concluded a trial court could not exclude a person who has previously asserted hisFifth Amendment privilege against self-incrimination from appearing as a witness on behalf of a criminal defendant. However, in Kirk, the Supreme Court of Ohio stated the holding in Cooper should be limited to its facts. In Kirk, after the prosecution addressed the possibility of calling Hoover as a witness, the court addressed Hoover's attorney, who said he advised Hoover not to testify. Thereafter, the court addressed Hoover, who said, if called, he would assert his Fifth Amendment privilege. The defendant's counsel argued he wanted to call Hoover regardless, and the trial court held that no party should call a witness to demonstrate that he would exercise his Fifth Amendment rights. TheKirk court limited and distinguished Cooper and held that a trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination. Id. at syllabus, paragraph one.
 {¶ 55} Thus, even if appellant had insisted or even asked that McKinney still be called as a witness despite McKinney's counsel's statement to the court that McKinney would assert his Fifth Amendment rights, there is nothing that mandates that the trial court had to grant such a request. *Page 27 
 {¶ 56} Despite Kirk's holding, appellant relies on State v.Reiner (2001), 93 Ohio St.3d 601 ("Reiner II"). In Reiner, a two-month-old child died as a result of shaken-baby syndrome, and the father was indicted on involuntarily manslaughter charges. Though the defense theory was that the babysitter was the perpetrator, the jury found the father guilty. Both parties subpoenaed the babysitter to testify at trial, and the trial court granted the babysitter transactional immunity. The Supreme Court of Ohio held the grant of immunity to the babysitter was erroneous because the babysitter had noFifth Amendment privilege because she denied being the perpetrator. The United States Supreme Court reversed, concluding that the babysitter did have a valid Fifth Amendment privilege even though she denied any involvement in the case; however, the Supreme Court did not address whether immunity under R.C. 2945.44 was appropriate. On remand, in a plurality opinion, the Supreme Court concluded the grant of immunity did not further the administration of justice. The plurality opinion stated:
 [T]his was an either/or situation. Either Reiner was guilty or Susan Batt was guilty. The government chose to indict Reiner and claimed that there was insufficient evidence to indict Batt. Batt continually claimed her innocence. However, immunity is not appropriate in the either/or situation; it could actually hinder the search for truth. The jury should have been permitted to hear Batt take the Fifth Amendment and to evaluate her testimony on that basis. The defense would have been able to present its theory of the babysitter's culpability without the court's giving the jury the impression that Batt was immune from prosecution because she did not commit the crime. Therefore, it did not further the administration of justice when the trial court agreed to grant her immunity from future prosecution. Instead, it severely prejudiced the rights of the defendant.
Id. at 605. *Page 28 
 {¶ 57} As we've mentioned, Reiner II is a plurality opinion, written by Justice Stratton, with two justices concurring, one justice concurring in judgment only, and three justices dissenting. Though it may be persuasive, a plurality opinion is not controlling because it fails to receive the support of the majority of the court. Hedrick v.Motorists Mut. Ins. Co. (1986), 22 Ohio St.3d 42, 44, overruled on other grounds. Also, the Reiner II court did not address Kirk since it makes no mention of the same. Lastly, we note our research has revealed no case that has cited Reiner II for the proposition set forth by appellant. In contrast, Kirk continues to be cited, as recently as the writing of this opinion, by appellate districts from around Ohio, forKirk's holding that a trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination.
 {¶ 58} Again, we reiterate that we are not presented with a scenario where any party desired to call McKinney to the stand once McKinney's attorney advised that McKinney would be asserting his Fifth Amendment privilege if called to testify. Rather, we are presented with an attorney's strategic act to not call a witness.
 {¶ 59} Based on the foregoing, we find no merit to appellant's third assignment of error and consequently overrule the same.
 {¶ 60} In his fourth assignment of error, appellant contends the trial court erred by sentencing him to maximum, consecutive prison terms in a manner that is unconstitutional. Specifically, he contends the remedy the Supreme Court of Ohio fashioned in Foster[2] to address the unconstitutional aspects of Ohio's sentencing *Page 29 
scheme, violates his rights under both the Due Process and Ex Post Facto Clauses of the United States and Ohio Constitutions.
 {¶ 61} The argument that, when retroactively applied,Foster's severance remedy violates due process or ex post facto principles has been made by a number of defendants who committed offenses prior to, but were sentenced after, Foster, and has been "considered and rejected * * * a number of times." State v. Jordan, Franklin App. No. 07AP-52, 2007-Ohio-5097, at ¶ 5. In fact, appellant concedes this court has previously determined that Foster does not violate the ex post facto or due process provisions of the state and federal constitutions. Nonetheless, appellant asks us to reconsider this position. Not only do we find no reason to alter the prior precedent of this court on this issue, we note that appellant committed the offenses for which he was convicted after the Supreme Court announced its decision in Foster. Therefore, Foster's application could not have been applied retroactively and would not violate the ex post facto prohibitions. State v. Brumbaugh, Licking App. No. 07-CA-30,2007-Ohio-5638.
 {¶ 62} Appellant next argues the trial court abused its discretion in sentencing him because there is no evidence the trial court considered the factors and purposes of sentencing, including the seriousness of the offense and recidivism factors, and the underlying facts do not warrant maximum consecutive sentences.
 {¶ 63} In accordance with R.C. 2953.08(G), when reviewing felony sentences, we examine whether clear and convincing evidence establishes that the defendant's felony sentence is contrary to law. State v.Burton, Franklin App. No. 06AP-690, 2007-Ohio- *Page 30 
1941. As will be explained below, we are unable to find by clear and convincing evidence that appellant's sentence is contrary to law.[3]
 {¶ 64} After Foster, trial courts are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than minimum sentences. State v. Frazier, 115 Ohio St.3d 139, at ¶ 208, citing Foster, at ¶ 100. Secondly, the trial court's judgment entry states that it considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12. Though the record is silent with respect to R.C. 2921.331(C)(5)(b), there is no requirement, statutory or otherwise, for the court to state its consideration of those factors in the record or make any specific finding in relation thereto. State v. Owen, Cuyahoga App. No. 89948, 2008-Ohio-3555. Also, appellant was found guilty of the charges based upon evidence presented at trial; therefore, the court necessarily considered those facts which fell within R.C. 2921.331(C)(5)(b). State v. Anderson, Cuyahoga App. No. 83285,2004-Ohio-2858. Moreover, a silent record raises a presumption that the trial court considered such factors. State v. Adams (1988),37 Ohio St.3d 295 (holding that absent any indication that a trial court did not, a silent record raises a presumption that the trial court considered the factors in R.C. 2929.12, and the defendant's failure to address the issue in the trial court leads to a presumption that the trial court considered those factors).[4]
 {¶ 65} Nor do we find merit to appellant's contention that the trial court erred in stating that appellant's acts constituted the "worst form of the offense" because the trial *Page 31 
court stated appellant stole an elderly woman's purse and fled when, in fact, it was a car and appellant was not charged with theft. No objection was made to this misstatement in the trial court, thus appellant has forfeited all but plain error. State v. Payne,114 Ohio St.3d 502, 2007-Ohio-4642. Plain error requires a showing that the outcome of the proceeding clearly would have been different. Id. We find appellant is unable to make that showing here. A jury convicted appellant of receiving stolen property and failure to comply and in doing so found that appellant was the driver of the car that fled from police and caused a car accident with innocent persons at an intersection. Further, given appellant's prior record, the capias issued because of appellant's failure to appear for the reading of his own verdict, a prior trial of appellant's for attempted murder that was dismissed after two days because of the victim's refusal to testify out of fear, we find the trial court's misstatement to be inconsequential. See State v. McNeill (1998), 83 Ohio St.3d 438.
 {¶ 66} Appellant also argues R.C. 2921.331(C)(5)(b) is unconstitutional because it violates Blakely and Booker as it requires the court, not the jury, to consider the enumerated factors. Although appellant now attempts to assert R.C. 2921.331 is unconstitutional, he failed to raise this argument before the trial court. It is well-settled that "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." State v. Awan (1986),22 Ohio St.3d 120, syllabus. Accordingly, we conclude appellant has waived this constitutional challenge for purposes of this appeal. State v.Rodgers, Franklin App. No. 06AP-808, 2007-Ohio-1501 *Page 32 
(defendant failed to raise issues regarding the constitutionality of the firearm specification statutory scheme pursuant toBlakely/Foster; therefore, he waived the issue for appellate purposes).
 {¶ 67} Based on the foregoing, we overrule appellant's fourth assignment of error.
 {¶ 68} For the foregoing reasons, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
BRYANT and BROWN, JJ., concur.
[1] Miranda v. Arizona (1966), 384 U.S. 435, 467-473, 86 S.Ct. 1602,1624-1627.
[2] State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, certiorari denied, 127 S.Ct. 442.
[3] The Supreme Court of Ohio recently addressed the standard of review on appeal of a felony sentence in State v. Kalish,2008-Ohio-4912. However, nothing in that plurality opinion alters the standard set forth by this court in Burton.
[4] We note that the plurality opinion of Kalish stated the following in footnote 4: "Of course, where the trial court does not put on the record its consideration of R.C. 2929.11 and 2929.12, it is presumed that the trial court gave proper consideration to those statutes." *Page 1